AO 91 (Rev. 11/11) Criminal Complaint

**FILED**
9/12/2024
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

TD

Trial Attorney Victor B. Yanz (202) 957-2993

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ANUAR ABDRAKHMANOV

CASE NUMBER:     1:24 - cr - 00427

**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. From in or around April 2024 to in or around September 2024, in the Northern District of Illinois, Eastern Division, and elsewhere, ANUAR ABDRAKHMANOV, the defendant, violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1956(h) | did knowingly conspire to engage in one or more monetary transactions in criminally derived property of a value greater than $10,000, which property was derived from one or more specified unlawful activities, namely health care fraud, in violation of Title 18, United States Code, Section 1347, knowing that the transaction involved criminally derived property, in violation of Title 18, United States Code, Section 1957. |

This criminal complaint is based upon these facts:

_X_  Continued on the attached sheet.

STEVE WARREN
Special Agent, HHS-OIG-OI

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: September 12, 2024

_Judge's signature_

City and state: Chicago, Illinois

Young B. Kim, U.S. Magistrate Judge
_Printed name and title_

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, Steve Warren, being duly sworn, state as follows:

1.      I am a Special Agent with the United States Department of Health and Human Services, Office of Inspector General, Office of Investigations ("HHS-OIG-OI") and have been so employed since October 2010.  In my capacity as a Special Agent, I have participated in numerous investigations of criminal activity involving, among other things, health care fraud, wire fraud, and mail fraud.  During the course of these investigations, I have conducted or participated in surveillance, the execution of arrest and search warrants, debriefings of informants and other witnesses, reviews of taped conversations, analysis of financial and telephone records, and I have reviewed claims data, medical records, and other business records.  As a result of my training and experience, I am familiar with techniques and methods of operation used by individuals involved in criminal activity to facilitate various kinds of fraud and to conceal their activities from detection by law enforcement authorities.  In addition to my work experience, I have received specialized training in the field of health care fraud from the HHS-OIG-OI and others.

2.      This affidavit is being submitted in support of a criminal complaint and arrest warrant.  For the reasons set forth below, I respectfully submit that this affidavit contains probable cause to believe that ANUAR ABDRAKHMANOV ("ABDRAKHMANOV") has violated Title 18, United States Code, Section 1956(h)

(Conspiracy to Commit Money Laundering). I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information communicated or reported to me during the investigation by other participants in the investigation. This affidavit is intended to show only that there is probable cause to support the complaint for the requested arrest warrant. This affidavit does not set forth all of my knowledge about this matter.

## FACTS SUPPORTING PROBABLE CAUSE

### I.   BACKGROUND

A. Relevant Individuals and Entities

3. According to United States Customs and Border Protection ("CBP") records, on or about May 26, 2023, the defendant ABDRAKHMANOV, a Kazakhstan national believed to be residing in Cook County, Illinois, entered the United States on a Kazakhstan passport and a J1 summer work visa that allowed him to stay within the United States until September 09, 2023. ABDRAKHMANOV has continued to reside within the United States and has applied for United States citizenship.

4. According to financial institution and company records, at certain times, ABDRAKHMANOV controlled durable medical equipment ("DME") company JL WEBB DME, LLC, dba PRIORITY ONE MEDICAL EQUIPMENT ("PRIORITY ONE").

5. According to sales documentation and company records, Co-conspirator 1, an Estonian national, was previously involved in the purchase of other DME companies that participated in the scheme discussed below.

2

6. According to sales documentation and company records, Co-conspirator 2, a Russian national, was involved with other DME companies that participated in the scheme discussed below and was the buyer of PRIORITY ONE.

7. According to witness interviews and sales documentation records, Co-conspirator 3 was involved in the purchase of other DME companies that participated in the scheme discussed below.

8. According to witness interviews, Co-conspirator 4 was involved in hiring, communicating with, and managing the employees of PRIORITY ONE.

9. According to company records filed with the Kentucky Secretary of State, PRIORITY ONE was formed in 2001, with Individual 1 listed as its owner, and was located in Warren County, Kentucky. According to Medicare records, PRIORITY ONE operates as a DME provider and has been approved by Medicare to supply medically necessary DME to Medicare beneficiaries. According to sales documentation records, on April 18, 2023, Co-conspirator 1 signed a letter of intent to purchase PRIORITY ONE from Individual 1. According to sales documentation records, on March 22, 2024, Co-conspirator 2 signed a Bill of Sale, Assignment and Assumption Agreement to purchase PRIORITY ONE. According to company records filed with the Kentucky Secretary of State, starting on or about April 5, 2024, ABDRAKHMANOV became the Member/Manager of PRIORITY ONE.

B. Relevant Financial Accounts

10. ABDRAKHMANOV opened and controlled business accounts for PRIORITY ONE at various financial institutions from March 2024 to the present.

11.    According to financial institution records, ABDRAKHMANOV opened the following financial accounts for PRIORITY ONE:

a.    PRIORITY ONE account x0911 at Financial Institution 1 on or about May 12, 2024;

b.    PRIORITY ONE account x3803 at a Financial Institution 2 on or about April 10, 2024;

12.    PRIORITY ONE account x8236 at Financial Institution 3 on or about April 11, 2024.

13.    PRIORITY ONE account x2026 at Financial Institution 4 on or about April 25, 2024.

14.    PRIORITY ONE account x1544 at Financial Institution 5 on or about June 10, 2024.

C.  <u>The Medicare Program</u>

15.    The Medicare program ("Medicare") is a federally funded health insurance program providing health benefits to individuals who are 65 years old or disabled.  Medicare is administered by the Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS").

16.    Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

17.     Individuals who qualify for Medicare benefits are commonly referred to as "beneficiaries."   Each beneficiary is given a unique Medicare identification number.

18.     Medicare covers different types of benefits, which are separated into different program "parts:" Medicare Parts A through D.  Medicare Part B covers medically necessary physician services and outpatient care, including DME, such as prosthetics, orthotics, continuous glucose monitors ("CGM"), urinary catheters, and ostomy pouches.

19.     DME companies, physicians, and other health care providers (collectively, "providers") that provide items or services to beneficiaries are able to apply for and obtain a National Provider Identifier ("NPI").  To participate in Medicare, providers are required to submit an enrollment application.  As provided in the application, every provider is required to meet certain standards to obtain and retain billing privileges to Medicare, including: (1) provide complete and accurate information on the application, with any changes to the information on the application reported within 30 days; (2) disclose persons and/or organizations with ownership interests or managing control; (3) abide by applicable Medicare laws, regulations, and program instructions; (4) acknowledge that the payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (5) refrain from knowingly presenting or causing to present a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of

their truth or falsity. Providers are provided with online access to Medicare manuals and service bulletins describing proper billing procedures and billing rules and regulations.

20.     Upon a change in ownership or managing control to an enrolled Medicare provider, the provider is required to re-submit an enrollment application setting forth details of the new ownership or managing control, including the names of all owners and managing employees, contact information, and a certification by any new individuals that they will abide by Medicare rules and regulations. The enrollment application must be approved by Medicare before the provider can be reimbursed for claims following a change in ownership or managing control.

21.     If Medicare approves the application, Medicare assigns the provider a Provider Transaction Access Number ("PTAN"). Providers assigned a Medicare PTAN to render services to beneficiaries can submit claims for reimbursement to Medicare that include the PTAN assigned to that provider. Payments under Medicare are often made directly to the provider rather than to a Medicare beneficiary. This payment occurs when providers submit the claim to Medicare for payment, either directly or through a billing company. CMS contracts with various companies to receive, adjudicate, process, and pay Medicare Part B claims, including claims for DME.

22.     Under Medicare Part B, DME is required to be reasonable and medically necessary for the treatment or diagnosis of the patient's illness or injury, ordered by

6

a medical professional, properly documented, and provided as represented to Medicare.

23.     Medicare uses the term "ordering/referring" provider to identify the physician or nurse practitioner who orders, refers, or certifies an item or service reported in that claim.  Individuals who order, refer, or certify these items or services are required to have the appropriate training, qualifications, and licenses.

24.     A Medicare claim is required to set forth, among other things, the beneficiary's name, the date the items or services are provided, the cost of the items or services, the name and identification number of the physician or other health care provider who orders the items or services, and the name and identification number of the provider who provides the items or services.  Providers convey this information to Medicare by submitting claims using billing codes and modifiers.

25.     Medicare regulations require providers to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom items or services are provided and for whom claims for payment are submitted. Medicare requires complete and accurate patient records so that Medicare can verify that the items or services are provided as described on the claim form and to permit Medicare to review the appropriateness of payments made to providers.

26.     Medigap, also known as Medicare Supplement insurance, helps fill "gaps" of Medicare coverage and is sold by private health insurance companies. A Medigap plan can help pay some of the remaining health care costs not covered by

Medicare, such as copayments, coinsurance, and deductibles. For DME claims, a Medigap plan generally covers the beneficiary's deductible which is approximately 20% of the claim's allowed amount.

27.     Medigap is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

## II.     **THE FRAUDULENT SCHEME**

### A. Overview of Investigation

28.     This investigation began in 2023, when HHS-OIG-OI and the Federal Bureau of Investigation ("FBI") identified a scheme to defraud Medicare by submitting claims for DME, specifically CGM, urinary catheters, and ostomy pouches, which were neither medically necessary nor provided as represented to Medicare. The investigation revealed that the perpetrators purchased DME companies that were already enrolled with Medicare, changed the ownership information with the respective secretaries of state, but failed to submit enrollment applications reflecting the change in ownership with Medicare. Following the sale, the DME companies electronically submitted tens to hundreds of millions of dollars of claims for DME, primarily continuous glucose monitors, urinary catheters, and ostomy pouches, that were not medically necessary and were not dispensed to beneficiaries as represented to Medicare. Investigators have identified at least twenty DME companies across the country that participated in this scheme, including PRIORITY ONE. ABDRAKHMANOV is the member/manager of PRIORITY ONE.

### B. Priority One Medical Equipment

29.     At the time of PRIORITY ONE's formation, Individual 1 was listed as its owner with the Kentucky Secretary of State.

30.     According to sales documentation records, on or about March 22, 2024, PRIORITY ONE was sold by Individual 1 to Co-conspirator 2 for a purchase price of approximately $200,000.00.

31.     When Co-conspirator 2 took ownership of PRIORITY ONE, a Medicare enrollment application was not submitted for this change of ownership, as required by Medicare.

32.     On or about April 5, 2024, an Annual Report was filed with the Kentucky Secretary of State, adding ABDRAKHMANOV as the Member/Manager of PRIORITY ONE.  A Medicare enrollment application was not submitted for this change in managing control, as required by Medicare.

C.  Beneficiary Complaints

33.     Beginning on or about May 5, 2024, Medicare began receiving telephone calls from beneficiaries to Medicare's complaint hotline, 1-800-MEDICARE, about PRIORITY ONE.  The hotline receives calls from the public regarding any Medicare-related issue, including fraud, waste, abuse, or quality of care issues.  Between May 5, 2024, and August 12, 2024, Medicare received approximately 250 beneficiary complaints listing PRIORITY ONE as the subject of the complaint, and many of the beneficiaries reported that they did not receive items or services from PRIORITY ONE.

D.  Medicare Beneficiary Interviews

9

34. Six Medicare beneficiaries residing within the Northern District of Illinois who allegedly received CGM devices and urinary catheters from PRIORITY ONE were interviewed. All six beneficiaries interviewed denied requesting or receiving any diabetic supplies from PRIORITY ONE and all six beneficiaries told investigators they did not have diabetes.

E. Surveillance of PRIORITY ONE

35. On July 29, 2024, a Monday, investigators conducted surveillance of PRIORITY ONE at its location at 330 US 31-W Bypass, Suite 401, Bowling Green, Kentucky 42101. At approximately 9:19 am, an investigator walked past the business and observed the business to be closed and empty. The investigator was able to see a hallway with offices that had lights on. A photograph of the location is depicted below.



36.     At approximately 9:42 am, investigators observed two females exit the business and walk away.  The two females were later identified by investigators as Employee 1 and Employee 2 of PRIORITY ONE, and Employee 1 was subsequently interviewed, as explained in further detail below.  At approximately 9:50 am, Employee 1 and Employee 2 returned to PRIORITY ONE and locked the door after entering.

F.  Interviews with Former Owner and Landlord of PRIORITY ONE

37.     On August 1, 2024, investigators interviewed Individual 1, the former owner of PRIORITY ONE, who advised as follows:

a.      Individual 1 sold PRIORITY ONE to Co-conspirator 2 through a brokerage firm.  Individual 1 received a letter of intent to purchase PRIORITY ONE from Co-conspirator 1.  Co-conspirator 3 handled all communications concerning the purchase of PRIORITY ONE on behalf of Co-conspirator 1.  At the closing for the sale, Individual 1 noticed that Co-conspirator 2, and not Co-conspirator 1, was listed as the buyer for PRIORITY ONE.  Co-conspirator 3 then informed Individual 1 that Co-conspirator 1 was out of the country and that s/he was replaced by Co-conspirator 2.

b.      The sale of PRIORITY ONE occurred remotely and Individual 1 never met Co-conspirator 1, Co-conspirator 2, or Co-conspirator 3.  Individual 1 never spoke to Co-conspirator 1 or Co-conspirator 2 and communicated with Co-conspirator 3 only through the telephone and by email.

c.      The buyers did not want to inspect the office space prior to the purchase, nor did they want any of PRIORITY ONE's equipment.

d.      Prior to the sale of PRIORITY ONE, Individual 1 was instructed by Co-conspirator 3 to open a business account for PRIORITY ONE at Financial Institution 1.  As a result of that instruction, Individual 1 opened business account x5577 for PRIORITY ONE at Financial Institution 1, and then submitted an updated Electronic Funds Transfer ("EFT") authorization to Medicare providing that Medicare monies for claim reimbursement to PRIORITY ONE be electronically deposited into PRIORITY ONE business account x5577 with Financial Institution 1. Individual 1 was also informed by Co-conspirator 3 to add Co-conspirator 2 to the account, and then Co-conspirator 2 would take over as the signatory of the account and remove Individual 1 from the account.  Financial Institution 1 closed the account and sent an email on or about April 14, 2024, to Co-conspirator 3, explaining that the account had been closed.

38.     On August 1, 2024, investigators interviewed Individual 2, the landlord of the building where PRIORITY ONE is located, who advised as follows:

a.      Individual 2 was first notified PRIORITY ONE was being sold in March 2024.  Co-conspirator 3 contacted Individual 2 via email on behalf of the purchaser, Co-conspirator 1.

b.      Co-conspirator 2 signed the lease for the suite in which PRIORITY ONE is located.  At the closing for the sale of PRIORITY ONE, Co-conspirator 3 arranged for the lease of PRIORITY ONE to be paid through September 2024.  After the new

12

owners took over the lease for PRIORITY ONE in March 2024, the office remained empty.

G. Site Inspection

39.    On August 7, 2024, a Wednesday, investigators visited PRIORITY ONE, entered the business, and encountered Employee 1 and Employee 3 inside. During their inspection of the interior of PRIORITY ONE, investigators viewed no indication a legitimate DME business was being run out of the location, as investigators did not observe any medical supplies or DME inside the business. Photographs from inside PRIORITY ONE are depicted below.





H. Employee Interviews

40.     On August 7, 2024, investigators interviewed Employee 1, who advised as follows:

a.      Employee 1 was hired to work at PRIORITY ONE after responding to a posting for an office manager position on Indeed.com.  On or about April 8, 2024, the same date s/he applied, Employee 1 was contacted by Co-conspirator 4 and participated in a telephone interview.  After the interview, Co-conspirator 4 explained to Employee 1 their job duties and subsequently hired Employee 1.

b.      Co-conspirator 4 told Employee 1 that all further communications would be through Telegram, which investigators know based on their training and experience to be an encrypted phone messaging application.  Employee 1 was paid $6,000 per month and worked at PRIORITY ONE Monday through Friday, 9:00 am to 5:00 pm.  Employee 1's job duties were to obtain, scan, and send the mail to Co-Conspirator 4 through Telegram.

c.      Employee 1 recalled seeing checks made payable to PRIORITY ONE for as large as $1 million.  Employee 1 even momentarily lost a check for $1 million, but when s/he found it, s/he was given a $2,000.00 bonus for finding the check.  Employee 1 was told by Co-conspirator 4 that PRIORITY ONE sold medical supplies and equipment.  Employee 1 denied seeing any patients or medical supplies and equipment at the PRIORITY ONE office.

d.      On or about June 12, 2024, a tall, Indian/Middle Eastern male came to PRIORITIY ONE to give Employee 1 a check for approximately $7,000.00.  Employee 1 witnessed this male drive away in a dark/black colored vehicle.  Investigators

14

showed Employee 1 a picture of ABDRAKHMANOV obtained from ABDRAKHMANOV's New York State driver's license, and Employee 1 believed the man who gave Employee 1 their first check was depicted in the photograph.

e.     Co-conspirator 4 instructed him/her to mail checks, a bank checkbook, and a key to PRIORITY ONE addressed to ABDRAKHMANOV at addresses in Bartlett, Cook County, Illinois and Schaumburg, Illinois.   Photographs of these communications over Telegram are depicted below:



41.     On August 7, 2024, investigators interviewed another employee of PRIORITY ONE, Employee 3, who advised as follows:

a.     Employee 3 was hired as an office manager after being referred by Employee 1.  On July 16, 2024, Employee 3 was interviewed and hired by Co-conspirator 4 via Telegram.  On July 17, 2024, Employee 3 started working at PRIORITY ONE.  Employee 3's job duties included answering the telephone, and checking, opening, and filing the mail.  All communications between Employee 3 and Co-conspirator 4 were done through Telegram.

b.     Per instructions from Co-conspirator 4, Employee 3 sent checks addressed to ABDRAKHMANOV at an address in Bartlett, Cook County, Illinois. The Fed Ex receipts to mail the checks are depicted below.



42.     According to witness interviews, on or about August 7, 2024, Employee 1 and Employee 3 quit their employment at PRIORITY ONE and left their keys to the business on a desk in the office.

43.     On August 8, 2024, investigators were contacted by Employee 1 after s/he received a message from Co-conspirator 4 via Telegram asking her/him to identify the key that opens the mailbox.  A photograph of that message is depicted below.



17

I. ABDRAKHMANOV's Visit to PRIORITY ONE

44.    On August 9, 2024, an investigator conducted surveillance of PRIORITY ONE at approximately 10:30 am.  The investigator observed a black Mazda car parked at the building where PRIORITY ONE is located.  Based on databases available to law enforcement, investigators were able to determine that the vehicle was registered to ABDRAKHMANOV from the State of Illinois.  The investigator observed an individual consistent with ABDRAKHMANOV's appearance entering and exiting PRIORITY ONE.  The individual appeared to install a security camera in the entrance of PRIORITY ONE.  At 10:37 am, the individual left the building for the last time, locked the front door to PRIORITY ONE, and left the area in the black Mazda.  Photographs of the individual at the location of PRIORITY ONE are depicted below.





45.     Below is a photograph of ABDRAKHMANOV taken from his New York State driver's license compared to a photograph taken of ABDRAKHMANOV from August 9, 2024, outside of PRIORITY ONE.



J.  <u>Medicare Billing Records</u>

46.     An analysis of the billing records of PRIORITY ONE revealed a high number of claims filed for beneficiaries who had been deceased for 30 or more days. For example, from March 27, 2024, through August 10, 2024, claims were filed by PRIORITY ONE for approximately 67 beneficiaries who were deceased for 30 or more days. Based on my training and experience, Medicare providers who repeatedly bill for items or services provided to dead beneficiaries are often using Medicare beneficiary information that has been purchased or unlawfully transferred, rather than collected in the ordinary course of their provision of bona fide medical services to beneficiaries. As such, repeated billing of items or services to dead beneficiaries is an indicator that the entity is engaged in fraudulent billing for items or services that are not medically necessary and/or not actually provided.

47.     According to records obtained from Medicare, on or about March 27, 2024, PRIORITY ONE began submitting claims to Medicare for CGM and urinary catheters in a significant and unusual manner. From approximately March 27, 2024, to August 10, 2024, PRIORITY ONE billed 461,527 claims for 49,990 Medicare beneficiaries, totaling approximately $666,496,560.00 billed to Medicare for CGM and urinary catheters for an intended paid amount of $202,371,501.00. The claims submitted included claims for hundreds of Medicare beneficiaries residing within the Northern District of Illinois.

48.     Medicare processed these claims for reimbursement to PRIORITY ONE but began suspending payments to PRIORITY ONE on or about July 17, 2024. As a

result, Medicare stopped check payments and suspended all claims reimbursement to PRIORITY ONE before Medicare funds were actually paid.

49.    However, records obtained from Medicare show that Medigap Supplemental insurers, as a result of these processed claims, received reimbursement requests to PRIORITY ONE valued at approximately $45,365,328.00.  Medigap Supplemental insurers then issued various checks to PRIORITY ONE for a portion of those reimbursement requests.  As of September 10, 2024, investigators have identified at least $200,000 of that total was deposited from Medigap Supplemental insurers into PRIORITY ONE's account at Financial Institution 1, from approximately May 22, 2024, to June 20, 2024, when ABDRAKHMANOV owned and controlled PRIORITY ONE and was the sole signatory on this account.  As of September 10, 2024, investigators have also identified at least $250,000 of that total was deposited from Medigap Supplemental insurers into PRIORITY ONE's account at Financial Institution 2, from approximately May 1, 2024, to June 30, 2024, when ABDRAKHMANOV owned and controlled PRIORITY ONE and was the sole signatory on this account.

### III.    LAUNDERING OF FRAUD PROCEEDS

A. Financial Transactions Conducted by ABDRAKHMANOV

50.    A review of PRIORITY ONE's financial records did not reveal financial activity consistent with the running of a large-scale DME business.  For example, a detailed review was unable to conclusively identify a large and consistent stream of expenses tied to business activities typically expected with the operation of a DME

business, such as CGM devices, urinary catheters, ostomy pouches, shipping and packaging fees, and/or storage fees. Furthermore, according to financial institution records, most of the funds that flowed into the PRIORITY ONE account at Financial Institution 1 were then wired to foreign bank accounts in China.

51. Financial institution records show that ABDRAKHMANOV opened PRIORITY ONE account x3803 at a Financial Institution 2 branch located within the Northern District of Illinois on or about April 10, 2024. According to financial institution records, ABDRAKHMANOV reported that he was the manager of PRIORITY ONE when opening this account. Since this account was opened, ABDRAKHMANOV has remained the sole signatory on the account. After ABDRAKHMANOV opened this account, Medicare records and financial institution records show that checks from Medigap Supplemental insurance companies began to be deposited into this account. These deposits were fraud proceeds. Between approximately May 1, 2024, and June 30, 2024, multiple wire transfers were completed, sending more than $200,000 of fraud proceeds to other accounts, including accounts in China. These wire transfers were of fraud proceeds because only deposits from Medigap Supplemental insurance companies provided sufficient funds in the account to perform the wires, since there were no other significant deposits into the account.

52. Financial institution records show that on or about May 12, 2024, ABDRAKHMANOV opened PRIORITY ONE account x0911 at Financial Institution 1. Those records show that after the account was opened, checks from Medigap

Supplemental insurance companies began to be deposited into this account. Financial institution records show that on or about June 3, 2024, when ABDRAKHMANOV was still the sole signatory on PRIORITY ONE account x0911 at Financial Institution 1, ABDRAKHMANOV began wiring funds from this account to accounts in Hong Kong, China. Between approximately June 3, 2024, to June 21, 2024, ABDRAKHMANOV sent six wire transfers from PRIORITY ONE account x0911 at Financial Institution 1 to accounts based in Hong Kong, China. These wires had a total value of approximately $182,000.00. These wire transfers were of fraud proceeds because only deposits from Medigap Supplemental insurance companies provided sufficient funds in the account to perform the wires, since there were no other significant deposits into the account.

53. Financial institution records show that when ABDRAKHMANOV opened PRIORITY ONE's account at Financial Institution 5, he presented his New York State driver's license which contained the same photograph depicted above in paragraph 45. Financial institution records and surveillance video show that on August 13, 2024, ABDRAHKMANOV traveled to a Financial Institution 5 branch located in Bowling Green, Kentucky, and deposited into PRIORITY ONE's account at Financial Institution 5 approximately 30 checks from Medigap Supplemental insurance companies that were made payable to PRIORITY ONE. These checks were fraud proceeds and had a cumulative value of approximately $22,510.00. Photographs of ABDRAKHMANOV at the Financial Institution 5 branch on this date are depicted below.

 

54. According to witness interviews, on August 14, 2024, ABDRAKHMANOV again entered the Financial Institution 5 branch located in Bowling Green, Kentucky. While within this bank branch, ABDRAKHMANOV spoke to a bank representative and inquired why a hold was put on funds that had been recently deposited into PRIORITY ONE's account at Financial Institution 5. According to witness interviews, a representative of Financial Institution 5 explained to ABDRAKHMANOV that they were investigating the transactions and that the funds were currently on hold. A representative of Financial Institution 5 reported to investigators that ABDRAKHMANOV was agitated by the funds being placed on hold. The representative further reported to investigators that ABDRAKHMANOV appeared to be relaying the information to someone over a cell phone. While at the bank branch of Financial Institution 5 on August 16, 2024, surveillance video showed ABDRAKHMANOV driving a black four door car depicted below, which appeared to

24

investigators to be the same vehicle previously observed as registered to ABDRAKHMANOV and at the PRIORITY ONE location.



## **CONCLUSION**

55.     Based upon the foregoing, and in support of a complaint and arrest warrant, I submit that this affidavit sets forth sufficient facts to establish probable cause to believe that, from in or around April 2024 and continuing through present, in the Northern District of Illinois, and elsewhere, defendant ABDRAKHMANOV, together with others, conspired to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).

FURTHER AFFIANT SAYETH NOT.

Steve Warren
Special Agent, HHS-OIG

SWORN TO AND AFFIRMED by telephone September 1 , 2024.

Honorable
United States Magistrate Judge